RECEIVED
USDC, WESTERN DISTRICT OF LA
TONY R. MOORE, CLERK
ALEXANDRIA, LOUISIANA
DATE 12/8/10
BY _____

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

ALEXANDRIA DIVISION

| | |
|---|---|
| **DERRICK LEVON CARTER** | **CIVIL ACTION NO. 1:06-cv-02150** |
| **-vs-** | **JUDGE DRELL** |
| **TIM WILKINSON, et al.** | **MAGISTRATE JUDGE KIRK** |

## RULING

Before the Court for decision after trial on the merits is a civil rights lawsuit brought by the Plaintiff, Derrick Levon Carter ("Mr. Carter"). Because Mr. Carter abandoned his claims against the first named Defendant, Warden Tim Wilkinson ("Warden Wilkinson"), the only remaining Defendant is Correctional Officer Norman Garrett ("CO Garrett"). A one-day bench trial in this matter was held on August 20, 2010. After reviewing the evidence on the record and presented at trial, as well as the parties' post-trial submissions, for the reasons given below, we find for PLAINTIFF, for damages totaling $3,250, plus applicable costs, interest, and attorney's fees.

### Background

This suit was originally filed on November 8, 2006. In his original Complaint (Doc. 1), Mr. Carter claims that he was subjected to excessive force while incarcerated at Winn Correctional Center ("WCC").[1] Specifically, Mr. Carter alleges that on April 14, 2006, CO Garrett was attempting to count the inmates visiting the infirmary and became "enraged by the taunting of [other] prisoners." (Doc. 1-1, p. 3). CO Garrett approached Mr. Carter in the infirmary waiting room and

---

[1] Mr. Carter is no longer incarcerated.

asked him for his identifying information.[2] Mr. Carter answered, at which point he claims that CO Garrett, without provocation, threw him against the wall of the infirmary waiting room and began to choke him. Other prisoners called CO Garrett's co-workers to restrain him, according to Mr. Carter, which ended the altercation. In compensation for this purported assault, Mr. Carter requests an award of $250,000 in compensatory and punitive damages.

Shortly after the incident, CO Garrett was transferred to a position in a guard tower. In this position, he would have no contact with inmates. He was, however, armed with a rifle, and authorized to exert deadly force upon prisoners if in his judgment it was warranted.

On March 13, 2007, the magistrate judge ordered Mr. Carter to amend his Complaint to reflect the following: (1) a specific description of the injuries that he allegedly sustained as a result of CO Garrett's actions; (2) facts sufficient to support supervisory liability by Warden Wilkinson; and (3) whether any disciplinary charges or sanctions were imposed upon Mr. Carter as a result of the altercation with CO Garrett. (Doc. 5). Mr. Carter thus filed an Amended Complaint (Doc. 6), alleging that he had trouble sleeping, headaches, and a negative attitude toward staff members following the incident. He further alleged that he did not receive any disciplinary charges or sanctions thereafter. Finally, Mr. Carter withdrew his claim against Warden Wilkinson, leaving CO Garrett as the only remaining Defendant in the case.

On April 11, 2007, the magistrate judge issued a Report and Recommendation that we dismiss Mr. Carter's lawsuit as frivolous, and for failure to state a claim upon which relief could be granted. (Doc. 7). The Court declined to adopt the Report and Recommendation and instead

---

[2] CO Garrett contends that he only asked Mr. Carter for his living unit and tier, while Mr. Carter claims that he was asked for his name and living unit. This dispute is not relevant to the outcome of the case.

referred the case back to the magistrate judge for the purpose of effecting service of process. (Doc. 10).

Mr. Carter filed a Motion to Appoint Counsel on May 11, 2009 (Doc. 28), which the magistrate judge denied the following day (Doc. 29). However, on January 22, 2010, this Court issued an order appointing attorney Ross Owen to represent Mr. Carter, noting that, pursuant to 28 U.S.C. § 1915(e), exceptional circumstances justifying the appointment were present. (Doc. 32). Subsequently, attorney Jeananne Self enrolled as additional counsel (Doc. 35), and Mr. Carter filed a Supplemental and Amending Complaint to add a request for attorney's fees, legal interest, and costs on July 29, 2010 (Doc. 40). These counselors represented Mr. Carter at trial.

<u>ANALYSIS</u>

## I. EXCESSIVE FORCE BY A CORRECTIONS OFFICER UNDER SECTION 1983

### A. Legal Standard

This lawsuit was brought under 42 U.S.C. § 1983, which provides, in part, as follows:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

To state a viable claim under 42 U.S.C. § 1983, "'a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law.'" *James v. Tex. Collin County*, 535 F.3d 365, 373 (5th Cir. 2008) (quoting *Moore v. Willis Indep. Sch. Dist.*, 233 F.3d 871, 874 (5th Cir. 2000)).

A claim based on a correction officer's use of excessive force against an inmate sounds in the Eight Amendment to the U.S. Constitution which forbids the infliction of "cruel and unusual punishments."

"Excessive force claims are necessarily fact-intensive; whether the force used is 'excessive' or 'unreasonable' depends on 'the facts and circumstances of each particular case.'" *Deville v. Marcantel*, 567 F.3d 156, 167 (5th Cir. 2009) (quoting *Graham v. Connor*, 490 U.S. 386, 396 [1989]).

Excessive force is judged under the Eighth Amendment by "whether [the] force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *see, Whitley v. Albers*, 475 U.S. 312, 323 (1986) (requiring, for a case to go to a jury, "a reliable inference of wantonness in the infliction of pain.").

Traditionally, in the Fifth Circuit, the factors to consider in evaluating whether force was applicied "in good-faith" or "maliciously and sadistically to cause harm" are: "1. the extent of the injury suffered; 2. the need for the application of force; 3. the relationship between the need and the amount of force used; 4. the threat reasonably perceived by the responsible officials; and 5. any efforts made to temper the severity of a forceful response." *E.g., Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999).

Earlier this year, the Supreme Court opined on the appropriate standard in excessive force cases, overruling a Fourth Circuit decision "[b]ecause the District Court's approach, affirmed on appeal, is at odds with [previous precedent's] direction to decide excessive force claims based on the nature of the force rather than the extent of the injury." *Wilkins v. Gaddy*, 130 S.Ct. 1175, 1176 (2010). In doing so, it specifically discussed that "[t]he Fifth Circuit has sometimes used language

indicating agreement with the Fourth Circuit's approach," citing to *Gomez*'s requirement that "[t]o support an Eighth Amendment excessive force claim a prisoner must have suffered from the excessive force a more than *de minimis* injury." *Id.*, at 1179, fn. 2. It also, though, cited other Fifth Circuit cases to the contrary, and it emphasized that its decision was not a change in the law but was based entirely on its earlier decision in *Hudson*, 503 U.S. 1, which overruled the Fifth Circuit's prior "significant injury" requirement. *Id.*, at 1178 (1992). As well, in that same case, the Supreme Court opined that:

> This is not to say that the absence of serious injury is irrelevant to the Eighth Amendment inquiry. The extent of injury suffered by an inmate is one factor that may suggest whether the use of force could plausibly have been thought necessary in a particular situation. The extent of injury may also provide some indication of the amount of force applied. [N]ot every malevolent touch by a prison guard gives rise to a federal cause of action.

*Id.*, at 1178 (internal citations and quotations omitted).

Thus, the exact state of the law at the time of the incident with regards to injury - whether the Fifth Circuit actually had a *de minimis* injury requirement or not - is unclear, and there is some tension between the traditional excessive force test in the Fifth Circuit and recent Supreme Court jurisprudence. To the extent that the Fifth Circuit test required some specific quantum of injury - regardless of the force applied - it appears to be overruled. Yet, the rest of the test - and its use of the extent of injury as one factor determining whether a particular use of force was excessive - appears, to this Court, to remain intact and still valid law.

**B. Application and Findings**

Ultimately, we need not resolve the question of whether the traditional Fifth Circuit test had a *de minimis* injury requirement and how, if at all, that test should be adjusted, for we find that, under

any standard, Defendant's use of force was excessive, and it caused Plaintiff a more than *de minimis* - if still comparatively minor - injury.

*1. Defendant's use of force was clearly excessive*

As discussed, in addition to Plaintiff's injury, the factors to consider in judging a correction officer's use of force under the Eighth Amendment are:

> 2. the need for the application of force; 3. the relationship between the need and the amount of force used; 4. the threat reasonably perceived by the responsible officials; and 5. any efforts made to temper the severity of a forceful response.

*Gomez*, 163 F.3d at 923. The evidence at trial was and is overwhelming as to these points, and we do not really consider it a close question.

At trial, CO Garrett admitted that he was the aggressor in the incident, and that Mr. Carter never physically attacked him, or even resisted. Specifically, CO Garrett testified that he was already angry because of the taunting of other prisoners when he approached Mr. Carter. While Mr. Carter testified that, in response to CO Garrett inquiring his name and living area, he answered fully, CO Garrett contends that Mr. Carter only responded with "huh," which he took (or mistook) as a continuation of the other prisoners' taunting. In response, CO Garrett attacked Mr. Carter, choking him around the next or upper chest area and aggressively slamming or shoving him against the wall. Neither party presented any evidence of any "need for the application of force," or "threat" which could have "reasonably [been] perceived by" Co Garrett. Defendant admittedly simply lost his cool and attacked the prisoner without any need or justification.

The other evidence supports this finding. Specifically, Warden Wilkinson testified at trial that CO Garrett breached WCC procedures by making physical contact with a prisoner after only a verbal provocation., a point admitted by CO Garrett in the "Employee/Civilian - Incident Statement"

(Def. Exh. 2, p. 10) he signed immediately following the attack.  The level of force used by CO Garrett exceeded what was required and allowed in response to a prisoners' verbal communications, even if Mr. Carter's response was sarcastic or dilatory.

The one possible mitigating factor in CO Garrett's favor is factor five, "any efforts made to temper the severity of a forceful response."  While Defendant lost his cool and attacked the prisoner maliciously and without provocation, his response could have been more violent than it was.

Regarding the severity of violence, unsurprisingly, the evidence presented by the parties is conflicting.  First, Mr. Carter testified that CO Garrett "slammed" him against the wall.  CO Garrett admitted this point in the incident report created immediately following the attack, twice stating that he "slammed" Mr. Carter against the wall.  (Def. Exh. 2, p. 10)  However, at trial, CO Garrett claimed that he did not intend to use that word, and that in actuality, he merely pushed Mr. Carter hard against the wall.

There was also disagreement regarding how many times Mr. Carter hit the wall, and whether CO Garrett's coworkers had to be called to separate him from Mr. Carter.

It is undisputed that CO Garrett is substantially larger than Mr. Carter, who is only 5'1 and weighs 120 pounds, and thus would have had little trouble overpowering him.  Likewise, it is undisputed that Mr. Carter was completely passive throughout the event.

Setting semantics aside, whether a slam or hard push against the wall and however the incident concluded, Defendant's use of force was more than the mere push or contact permitted and sometimes necessary to maintain control and discipline in a prison setting, but it was not as severe as it could have been.  Defendant could have thrown Plaintiff to the ground and kicked him repeatedly in the head, pressed his attack further at the moment it occurred, or waited until an

opportune moment and beaten Plaintiff violently at his leisure.  He did not do these things.  He momentarily lost his temper and responded to a verbal provocation by malicious attacking Defendant to try to cause him some pain, but no more.  The law recognizes different degrees of violence, and while Defendant's use of force was excessive, we acknowledge find that it could have been much worse.

Likewise, we recognize that CO Garrett has never attempted to cover up the incident, reporting it immediately at the time it occurred and admitting his fault ever since.  As discussed below, these facts are relevant to and reflect in the relief we assess.

*2. Mr. Carter suffered a more than* de minimis *injury*

Whether Plaintiff suffered an injury was an issue earlier in this case, (*see*, doc. 7), and Defendant continued to contest this point at trial.  In particular, he presented medical records and testimony from the nurse who treated Mr. Carter that Mr. Carter had suffered no injury.  Likewise, in the post-incident report discussed above, Mr. Carter checked a box indicating that he had not suffered any injuries.  (Def. Exh. 2, p. 11).

Mr. Carter disputes the content and significance of this evidence.  He admits to the substance of the above, but he claims that he gave these answers and otherwise did not approach any outside law enforcement after the incident because he thought they were the answers prison officials wanted to hear, and because he feared retaliation.  He also asserts that he generally did not maintain warm relations with WCC staff and was not in the practice of approaching them for assistance when he was suffering from a problem or injury.

Instead, Mr. Carter testified that he had a "knot" on his head immediately following the incident due to his head colliding with the wall, and light bruising around his neck where Defendant

8

choked him. Furthermore, he testified that he suffered from headaches, sleep deprivation, and general mental problems manifested in a negative attitude following the incident. He testified that he purchased and took common pain medication to treat his headaches.

We find Mr. Carter's description of his injuries credible. We agree that not every injury requires major medical attention, and it is entirely plausible that an inmate suffering from minor but real injuries would not wish to bring these to the attention of prison officials following an attack by a guard. Moreover, the injuries he describes are exactly the injuries one would expect following an attack the likes of which he undisputably suffered. So, while the injuries alleged by Mr. Carter were likely not conspicuous or severe, they were more than *de minimis*, in common parlance, "minor."

As discussed above, while these facts do not absolve Defendant of liability, they do indicate to this Court that CO Garrett's use of force, while unjustified, excessive, and maliciously intended to cause pain, was not as severe as it could have been. Mr. Carter had headaches and a knot on his head, not a fractured skull; he had bruises around his upper chest or throat area, not broken bones and bruises all over his body. These facts are noted by this Court and reflected in both our compensatory and our punitive damages calculations below.

## II. QUALIFIED IMMUNITY

### A. Legal Standard

"The Supreme Court has repeatedly held that 'government officials performing discretionary functions [enjoy] qualified immunity, shielding them from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" Good v. Curtis, 601 F.3d 393, 400 (5th Cir. 2010) (quoting Anderson v. Creighton, 483 U.S. 635, 638 [1987]). The Fifth Circuit has provided the following recent summary of the law

9

governing qualified immunity:

> Qualified immunity protects public officials from suit unless their conduct violates a clearly established constitutional right. The qualified immunity standard gives ample room for mistaken judgments, by protecting all but the plainly incompetent or those who knowingly violate the law. Thus, a public official is entitled to qualified immunity unless a plaintiff demonstrates (1) a violation of a constitutional right and (2) that the right at issue was clearly established at the time of the violation. Following [*Pearson v. Callahan*, 129 S.Ct. 808, 815-16,(2009)], a court has discretion to render judgment on an official's qualified immunity without reaching the first question.

*DePree v. Saunders*, 588 F.3d 282, 287 (5th Cir. 2009) (internal citations and quotations omitted).[3]

> To overcome the affirmative defense of qualified immunity, a plaintiff must show that the government official violated clearly established statutory or constitutional rights of which a reasonable person would have known. Qualified immunity shields from civil liability all but the plainly incompetent or those who knowingly violate the law. If the law at the time of a constitutional violation does not give the officer "fair notice" that his conduct is unlawful, the officer is immune from suit. This standard thus protects an officer with a mistaken, yet reasonable, understanding of the law from the hazy border between excessive and acceptable force. Accordingly, the "objective legal reasonableness" of an officer's conduct must be assessed in light of the legal rules that were "clearly established" at the time of his action. A right is clearly established if, in light of preexisting law, the unlawfulness of an action would be apparent to a reasonable officer.

*Manis v. Lawson*, 585 F.3d 839, 845-46 (5th Cir. 2009) (internal quotations and citations omitted).

## B. Application and Findings

Based on the above standard, this question in this case is not close. A corrections officer can face many decisions along the "hazy border between excessive and acceptable force." This is not one of them.

---

[3] The Supreme Court in <u>Pearson</u> held that, while the sequence of the two-step qualified immunity analysis, as set forth in <u>Saucier v. Katz</u>, 533 U.S. 194 (2001), is appropriate, it "should no longer be regarded as mandatory." 129 S.Ct. at 818. Instead, "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." <u>Id.</u> *See also, Manis v. Lawson*, 585 F.3d 839, 843 ("After *Peason*, a court may conduct the two-pronged qualified immunity inquiry . . . in any sequence.") (internal citations omitted).

This fact is reflected in CO Garrett's post-trial submissions on this topic.  (Doc. 47, p. 8).

Almost the only argument made for qualified immunity is that, at the time of the incident, the Fifth

Circuit maintained a *de minimis* injury requirement for Eighth Amendment corrections officer

liability, and thus CO Garret could not know that he could be liable for causing the injuries here.

We rejected this contention earlier in the case in denying CO Garrett's motion to dismiss on lack of

*de minimis* injury grounds.  (Doc. 7, p. 4; Doc. 10).  Whether that statement of the applicable law

at the time of the incident is correct or not, we consider the contention moot given the evidence

presented at trial and our findings above that Mr. Carter suffered various real physical injuries -

along with post-incident pain and headaches - that more than meet any *de minimis* standard.

Otherwise, as CO Garrett and Warden Wilkinson testified, CO Garrett breached clearly

established WCC procedures by making physical contact with a prisoner after only a verbal

provocation.  A corrections officer may make acceptable incidental contact with inmates in the

ordinary course of his duties, and he may use varying degrees of force against inmates when needed

to maintain order and discipline or if he is under threat.  *Gomez*, 163 F.3d at 923.  We know of no

authority permitting a wanton attack on an inmate without any justification, disorder, or threat, and

the parties cite to none.  Accordingly, we find that the Eighth Amendment right of an inmate not to

be attacked by a corrections officer without provocation was clearly established in light of

preexisting law at the time of the incident, and that the unlawfulness of CO Garrett's action, as he

admitted, was reasonably and objectively apparent.  *Manis*, 585 F.3d at 845-46; *see also, e.g.*,

*Anthony v. Martinez*, 185 F.Appx. 360, 363 (5th Cir. 2006) (upholding judgment for inmate because

"[a]t the time of the incident, it was clearly established that inmates have a constitutional right to be

free from the use of excessive force.") (citing *Hudson*, 503 U.S. at 5-10).

## III. RELIEF - AWARD AND DAMAGES[4]

The full range of common law remedies is available to a plaintiff who asserts a claim under § 1983. *Memphis Cmty. Sch. Dist. v. Stachura*, 477 U.S. 299, 306 (1986) ("When § 1983 plaintiffs seek damages for violations of constitutional rights, the level of damages is ordinarily determined according to principles derived from the common law of torts."). A Court may award nominal, compensatory, and punitive damages, plus costs and interests. A prevailing § 1983 plaintiff may also collect attorney's fees, though such fees in inmate litigation are separately governed and limited by the Prison Litigation Reform Act (PLRA), discussed in detail below.

### A. Compensatory and Punitive Damages

#### 1. Plaintiff's entitlement to damages

The primary purpose of the damages remedy in Section 1983 litigation is "to compensate persons for injuries caused by the deprivation of constitutional rights." *Carey v. Piphus*, 435 U.S. 247, 254 (1978) (procedural due process claim). Damages must be proved, and absent proof of actual injuries, a plaintiff is entitled only to nominal damages. *Id.*, 435 U.S. at 264 ("[A]lthough mental and emotional distress . . . is compensable under § 1983, neither the likelihood of such injury nor the difficulty of proving it is so great as to justify awarding compensatory damages without proof that such injury was actually caused."). In prison inmate litigation, an inmate may not maintain a suit "for mental or emotional injury . . . without a prior showing of physical injury." 42 U.S.C. § 1997e(e).

"[P]unitive damages may be awarded only when the defendant's conduct is 'motivated by evil intent' or demonstrates 'reckless or callous indifference' to a person's constitutional rights.'"

---

[4] For a general discussion of this topic, *see*, Federal Judicial Center, *Section 1983 Litigation* (2nd ed. 2008).

*Williams v. Kaufman County*, 352 F.3d 994, 1015 (5th Cir. 2003) (internal quotations omitted). The latter does not require "egregious misconduct." *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 538-39 (1999). However, it does require "recklessness in its subjective form," i.e. "a 'subjective consciousness' of a risk of injury or illegality and a 'criminal indifference to civil obligations.'" *Williams*, 352 F.3d at 1015 (citing *Kolstad*, 527 U.S. at 526).

As discussed above, we find that Plaintiff has proved that he suffered a physical injury, specifically a knot on and pain to his head and bruising around his neck and / or upper chest. We also find that, among various resulting mental difficulties, he has suffered at least pain, headaches, and trouble sleeping immediately following the event.

## 2. *Value of damages*

Until recently, the Fifth Circuit in inmate excessive force cases maintained a "significant injury," and then arguably a 'more than *de minimis* injury absent force repugnant to the conscience of mankind' requirement. *See,* discussion, *supra* Part I.A; *Gomez*, 163 F.3d at 923; *Rankin v. Klevenhagen*, 5 F.3d 103, 108 (5th Cir. 1993). Consequently, few awards based on the type of minor but real injuries and excessive but not shocking force that we find here exist in this Circuit. Instead, most cases have featured either more severe injuries and thus larger compensatory awards, or severe rights violations and thus nominal compensatory but ruinous punitive damages. *E.g.*, *Williams*, 352 F.3d 994 (nominal damages but $15,000 punitive damages for racially charged unjustified strip searches); *Brady v. Louisiana*, 998 F.2d 1013 (5th Cir. 1993) ($15,000 actual and $10,000 punitive damages for unprovoked attack resulting in injuries requiring two month hospital stay); *Keyes v. Lauga*, 635 F.2d 330 (5th Cir. 1981) ($75,000 for arrestee for multiple savage and unwarranted beatings); *Braud v. Painter*, 730 F.Supp. 1 (M.D. La. 1990) ($400,000 for fractured skull, resulting

13

from a punch to the face by a young officer, who was a former boxer, against an elderly victim, which knocked the victim to the ground unconscious, causing his head to violently his the ground).

On the other hand, this is hardly a case of first impression. Other Circuits have maintained a standard consistent with recent Supreme Court precedent for years, and, while rare, similar cases are not entirely unknown in this Circuit. Based on the evidence presented at trial about Plaintiff's injuries and Defendant's maliciousness discussed above, and our analysis of similar cases, we find an award of $1,250 compensatory damages and $2,000 punitive damages to be warranted. *See, e.g., Luken v. Lynaugh*, 98 F.3d 1339 (5th Cir. 1996) ($200 actual damages plus several thousand dollars in attorney's fees to previously unruly inmate who was shoved against wall and then on ground by corrections officer, resulting in bruise and three stitches to elbow); *Magee v. Dixon Correctional Institute*, 20 F.3d 470 (5th Cir. 1994) ($3,500 compensatory damages and $1,500 total punitive damages for persistent back injury resulting from attack by guards, who pushed inmate to ground and kicked him repeatedly); *Dills v. Caldwell*, F.Suppp.2d 2006 WL 2469352 at *1-2 (W.D. Tex. 2006) ($1,000 actual damages for inmate briefly choked by corrections officer in sudden, unprovoked attack, resulting in complaints of chest pain and unverified head and neck injuries); *Farella v. Hockaday*, 304 F.Supp.2d 1076 (C.D. Ill. 2004) (compensatory damages of $1,000 following malicious attack resulting in a "not . . . insignificant injury" requiring stitches in inmate's ear); *Walker v. Bain*, 257 F.3d 660, 663-64 (6th Cir. 2001) (award of $426 for retaliatory restraining resulting in "minor scrapes and cuts to [Plaintiff's] hands and wrists); *Douglas v. Owens*, 50 F.3d 1226, 1230 (3rd Cir. 1995) ($3,000 compensatory damages, spread among multiple defendants, for two beatings by baton by guards during prison riot resulting in complained of chest pain, but not bruises or contusions on chest); *Cornell v. Gubbles*, F.Supp.2d, 2010 WL 3937597 at *1 (C.D. Ill)

(award), 2008 WL 4185694 at *2 (description of injures) ($1,000 compensatory damages for excessive force used in"scuffle" between inmate and corrections officer resulting in knot to head and several bruises); *Hynes v. LaBoy*, 887 F.Supp. 618, 622 (S.D.N.Y. 1995) (award of $1,250 damages to inmate for injuries including two cuts and black eye, and $1,500 to corrections officer for kick in the testicles).

Dealing with the punitive damages specifically, while many cases result in larger punitive awards, even when only nominal compensatory damages are given, we reiterate the facts noted above that Defendant, while he intended to violate Plaintiff's constitutional rights and cause him injury and thus punitive damages are warranted, also restrained himself; the attack, force used, and resulting injuries could have been much worse. As well, Defendant reported the incident immediately and has admitted his fault ever since.  We consider $2,000 punitive damages a significant sum for an ordinary employee to pay and adequate punishment to deter similar behavior by this and / or other actors in the future.  We note, however, that we consider some punitive damages necessary given the maliciousness, however temporary, with which Defendant acted, and that Defendant has apparently not otherwise been punished at all for this incident, aside from being transferred to the guard tower - and armed with a rifle - away from day-to-day dealings with the inmate population.

## B. Attorney's Fees, Interest, and Costs

Typically, a prevailing plaintiff in a civil rights action is entitled to recover his reasonable attorney's fees, unless there is a showing of special circumstances that would make such an award unjust. *See Dean v. Riser*, 240 F.3d 505, 508 (5th Cir. 2001). However, the availability of attorney's fees in inmate litigation is restricted by the Prison Litigation Reform Act (PLRA), while states:

(1) In any action brought by a prisoner who is confined to any jail, prison, or other

correctional facility, in which attorney's fees are authorized under section 1988 of this title, such fees shall not be awarded, except to the extent that--

    (A) the fee was directly and reasonably incurred in proving an actual violation of the plaintiff's rights protected by a statute pursuant to which a fee may be awarded under section 1988 of this title; and

    (B)(i) the amount of the fee is proportionately related to the court ordered relief for the violation; or

    (ii) the fee was directly and reasonably incurred in enforcing the relief ordered for the violation.

(2) Whenever a monetary judgment is awarded in an action described in paragraph (1), a portion of the judgment (not to exceed 25 percent) shall be applied to satisfy the amount of attorney's fees awarded against the defendant. If the award of attorney's fees is not greater than 150 percent of the judgment, the excess shall be paid by the defendant.

(3) No award of attorney's fees in an action described in paragraph (1) shall be based on an hourly rate greater than 150 percent of the hourly rate established under section 3006A of Title 18 for payment of court-appointed counsel.

42 U.S.C. § 1997e(d); *see generally*, Robert L. Rossi, *Attorney's Fees* § 10:33, (3rd ed., updated July 2010).

This statute limits the attorney's fees assessable against a defendant to 150% of total damages. In this case, where damages are $3,250, the result is a maximum possible fee assessment of $4,875.

The Court ordinarily begins its determination of what constitutes reasonable attorney's fees from the "Lodestar" method, multiplying the time "reasonably expended on the litigation" by the applicable hourly fee. *See, Louisiana Power & Light Co. v. Kellstrom*, 50 F.3d 319, 323-325 (5th Cir. 1995). We recognize that Plaintiff's counsel likely spent more than enough time preparing for and trying this case to warrant a fee at least as large as the maximum discussed above, without having to consider adjustment by the Court. *See, Id.* (discussing a court's ability to adjust fees calculated by the Lodestar method) (citing *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 [5th Cir. 1974]). Regardless, we order Plaintiff's counsel to submit proof of its time expended - in

accordance with applicable precedent and the PLRA above - to this Court so that a fee determination may be made.

As noted, Plaintiff is also entitled to costs and interest. We request that Plaintiff's counsel submit a summary of such costs with its fee calculations so that a single, unified judgment and award may be entered. Finally, the PLRA vests the Court with significant discretion over how to allocate the payment of attorney's fees between Plaintiff and Defendant. 42 U.S.C. § 1997e(d)(2). As the fee award is yet to be made, we refrain for the present from rendering a decision on this point; instead, we will do so when we issue our final judgment and award calculation.

### CONCLUSION

As discussed above, we find that Defendant, in violation of clearly established federal law at the time, used excessive force in attacking and choking Plaintiff, causing him various physical and mental injuries, including a knot on the head, bruising, headaches, and pain, for which we award Plaintiff $1,250 in compensatory damages and $2,000 in punitive damages. Plaintiff is also entitled to costs, attorney's fees, and interest, a description of which Plaintiff's counsel is requested and ordered to submit to the Court. Once the Court receives this submission, we will make our final calculations about the total and distribution of payments and issue a final judgment to that effect.

SIGNED on this _8_ day of December, 2010 at Alexandria, Louisiana.

DEE D. DRELL

UNITED STATES DISTRICT JUDGE

17